Date signed April 06, 2016



ROBERT A. GORDON
U. S. BANKRUPTCY JUDGE

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Baltimore

In re:                                             *

Tara Artrise Owens                                 *        Case No.12-24539-RAG
                                                            Chapter 13
                                                   *
        Debtor                                     *
                                                   *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

Toby Jones                                         *

        Plaintiff                                  *

v.                                                 *        Adversary No.  12-00792

Tara Artrise Owens                                 *

        Defendant                                  *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION IN SUPPORT OF JUDGMENT
## ORDER DECLARING DEBT DISCHARGEABLE

**I.      Preliminary Statement**

        This Adversary Proceeding presents the question of whether in the midst of a budding

romantic relationship, loans from one friend to another were made on the basis of the

Defendant's intentional misrepresentations that caused either the reasonable (or justifiable)

1

reliance of the Plaintiff or were instead made out of a hasty, yet admirable, desire to help as an effort toward the strengthening of a relationship and with a substantial understanding and acceptance of the attendant risk.  The Court concludes that the Plaintiff extended credit out of a combination of friendship and attraction to the Defendant and that, moreover, the Defendant's brutally honest representations as to her woeful financial circumstances could not trigger the sort of reasonable (or justifiable) reliance required for actionable fraud.  By the same token, the Court finds that the Defendant did not intend to fraudulently deceive the Plaintiff into making the loans but instead was as forthcoming as was necessary under the circumstances about her financial standing at the time the representations were made.  Because the Defendant's key representations regarding her utter insolvency and dismal financial track record were made in the context of her honest "soul-bearing," they could not have been made to mislead or defraud.  The Court concludes that the Defendant's inability to repay the loan as quickly as both parties had hoped was simply the result of the same personal financial incompetence starkly revealed in the first instance.  Therefore, the Plaintiff's prayer that her loans to the Debtor should be declared non-dischargeable under 11 U.S.C. § 523(a)(2)(A) and (B)[1] will be denied.

## II.  **Procedural Background**

Defendant, Tara Artrise Owens, filed her Chapter 13 bankruptcy case on August 7, 2012. This Adversary Proceeding was commenced on November 19, 2012 by Toby Jones who was unrepresented at that time. Ms. Owens (who was represented) filed a Motion to Dismiss (Motion) on December 18, 2012 (Dkt. No. 7).  The Motion averred that the Complaint failed to adequately state a claim for relief under F.R.Civ.P. 12(b)(6) (made applicable by Federal Rule of Bankruptcy Procedure 7012(b)) and the standards of *Ashcroft v Iqbal*, 566 U.S. 662 (2009) and

---

[1] Unless otherwise noted all statutory citations are to the Bankruptcy Code (Code) found at Title 11 of the United States Code.

*Bell Atlantic v. Twombly*, 500 U.S. 544 (2007).  On January 11, 2013, Ms. Jones filed an Opposition to the Motion (Dkt. No. 10).[2]

The Motion was heard on January 23, 2013, the day of the pre-trial conference.  Paul Newhouse, Esquire, appeared and argued on behalf of Ms. Jones.[3]  All in all, it seemed the Complaint alleged enough colorable and specific allegations of fraud to withstand an assault upon its sufficiency.  Hence, the Motion was denied (Dkt. Nos. 11 and 12) with deference given to (a) the Plaintiff's prior unrepresented status and (b) the fact that a fraud claim necessarily involves an examination of the accused's intent which almost always requires live testimony.  A Scheduling Order was entered on February 11, 2013 with trial set for July 24, 2013.  Ms. Owens filed her Answer on February 12, 2013.  (Dkt. No. 16)

The parties complied with the Scheduling Order and the matter was substantially ready for trial on the date assigned.[4]  Ms. Jones requested in her Pre-Trial Statement that an amendment to the Complaint be permitted to "bring claims under § 523(a)(2)(B) as well as § 523(a)(2)(A)" based upon the facts already alleged.  This was necessary because at its core, Ms.

---

[2] While in the Opposition Ms. Jones described herself as unrepresented, one might not have been able to tell that from the paper's quality.  It was written in "legal-ease" and succinctly set forth the necessary rebuttals.  For example, Ms. Jones asserted in defense of her Complaint that:

> Plaintiff alleged facts constituting a section 532(a)(2)(A) (sic) claim in this case.
>
> *          *          *
>
> As fraud claims are excluded from discharge under section 1328(a)(2) and the elements of a section 532(a)(2)(A) (sic) claim were pled in the complaint, the debtor's contention that the creditor failed to state a claim under Rule 12(b)(6) has no merit.[2]

Pl.'s Resp. in Opp'n to Def.'s Mot. To Dismiss at 5, Dkt. No. 10. Citing cases, the Plaintiff also asserted that the Court should give a "liberal construction" to papers filed by *pro se* litigants.

[3] Mr. Newhouse entered his appearance in writing on June 10, 2013 (Dkt. No. 20).

[4] On July 3, 2013, the Defendant filed a Motion for Summary Judgment (Dkt. No. 23).  It was taken under advisement and shall be denied in the Judgment Order accompanying this Opinion.

Jones' case relies upon emails written by Ms. Owens that set forth in great detail her personal financial condition. *Blackwell v. Dabney* (*In re Blackwell*), 702 F.2d 490 (4th Cir. 1973); *Engler v. Van Steinburg* (*In re Van Steinburg*), 744 F.2d 1060 (4th Cir. 1984). The Plaintiff also wisely abandoned her 11 U.S.C. § 727 objection to the Defendant's discharge as there was no viable basis alleged for a denial of discharge. The Defendant did not object to these revisions and the request to amend was granted conditioned upon the Plaintiff filing a subsequent motion.[5] At trial, both Ms. Jones and Ms. Owens testified. No other witnesses were called and there were no objections to any of the documents offered into evidence. The trial lasted one day and post-trial memoranda (Dkt. Nos. 38, 39 and 42) were thereafter filed. Closing arguments were heard on November 26, 2013 and the matter is ripe for ruling.[6]

## III.    **Factual Findings**

The Plaintiff, Ms. Jones, and the Defendant, Ms. Owens, first became acquainted in 2005 when Ms. Owens was coaching college basketball and the Plaintiff was working as a game referee. Trial Tr. 13:14-17, July 24, 2013. The friendship grew closer in 2009 and in approximately March 2010, they began a romantic relationship that extended at least until October 2010. Trial Tr. 14:5-14. Between October and late December 2010, even after the parties' romantic involvement ended, they remained close as evidenced in part by the Plaintiff keeping articles of clothing at the Defendant's home. Trial Tr. 62:19-25; 63:1-2.[7]

---

[5] That was done on November 25, 2013 (Dkt. No. 43).

[6] To be candid the matter was long ago ripe for ruling and the responsibility for the delay in completing this Opinion lays entirely with the Oversigned. I deeply apologize to both parties and their attorneys for not completing this Opinion within a reasonable time after oral argument.

[7] Ms. Jones asserted the romantic relationship ended in October, 2010. Ms. Owens testified that it went on until December 2010 as reflected by Ms. Jones regular visits and the articles of clothing left in Ms. Owens' apartment.

For a period leading up to June 2010, and when they were romantically involved, Ms. Jones noticed that Ms. Owens was out of sorts. Ms. Jones testified as to her observations:

> Over the course of those couple of months, Tara was moody on occasions, appeared to be stressed and I would often ask her what was wrong and she would kind of disregard that and tell me that she would tell me when she had to.

Trial Tr. 14:19-22; 50:9-14; 71:15-18.

Ms. Owens' motivation to open up to her friend came on or about June 2, 2010 when the Commonwealth of Virginia garnished her bank account in order to recover a portion of her unpaid taxes. This left her with only a few dollars. So immediately after learning of the Commonwealth's action, she wrote an email (June 2nd Email) to Ms. Jones that laid out her overwhelming financial difficulties alongside a plea for help. *See* Trial Tr. 21:9-11. [8] In part, the June 2nd Email read:

> I already know that I have to be one of the most careless, irresponsible individuals in the world at this moment and I already know my decision making skills have [expletive deleted] over the past few years. . . . I realize the things I am experiencing are from poor, bad or no management or judgement. . . . I have been operating in a way that I cant (sic) even explain without reason other than living and just not thinking.
>
> *            *            *
>
> I did not know, had no idea actually that I owed [state taxes].
>
> *            *            *
>
> My bank account is shut down and they will take anything I get until the lien is paid… Meanwhile I have every bill coming out of the [expletive deleted]… Evertything (sic) is late, past due, I can't even use my credit cards. . . .

---

[8] Ms. Jones testified that she had no reason to believe that Ms. Owens was in any financial difficulty prior to receiving the June 2nd email although she had helped Ms. Owens financially on a limited basis on two previous, non-dire occasions. Ms. Owens testified that she and Ms. Jones had engaged in personal budgeting discussions designed to help Ms. Owens prior to June 2, 2010. Ms. Owens wrote the June 2nd Email in part as if she intended to respond to questions and concerns previously raised by Ms. Jones.

Meanwhile I have to pay rent, my storage, gas, electric, phones about to get shut off!!!!  Everything, my tags for my car are expired… I have 9 [expletive deleted] dollars.

I have to move and I filled out an application, my credit [expletive deleted], I cant even do that!!!!

\*      \*      \*

I NEED HELP!!!!!!!!!!!!!!!!!!!!! I don't have anyone I can even share this with.

\*      \*      \*

I called [a lender] to see if I could get a personal loan to try to get this stuff together, I was excited it sounded hopeful, the lady said I could borrow $15,000.00 for 2 to 3 years paying back $300 to $350 a month initially, but with a credit score of 2, no bank will do it until I get a good payment history and get the score up.  I couldn't even get the $4,300.00.

Pl.'s Ex. 1 at 1-3.  It would be a fair assessment of this to say that Ms. Owens' personal, financial

dam had burst and she was drowning in the ensuing flood.  However, it would likewise have to

be exceedingly obvious to any reasonably intelligent person that this state of affairs could not

have arisen overnight – it had to be the result of lengthy financial mismanagement, as Ms.

Owens readily admitted.  The June 2nd Email also included Ms. Owens' monthly budget (which

showed a consistent net shortage) and a summary of her overdue debts, totaling $64,665.  She

also implies in it that she had unsuccessfully attempted to obtain money from her mother.  In

sum, Ms. Owens told Ms. Jones that she 1) had been making bad economic choices for years, 2)

had little in the way of good judgment when it came to her finances, 3) was over two and a half

years late in filing her 2006 tax returns, 4) had $64,665 in past due debt – approximately the

amount of her yearly salary, 5) had only $9 available, 6) was in the red in expenses every month,

7) could not obtain money from her mother, much less a financial institution and 8) had a credit score of only 2.

Nevertheless, upon reading Ms. Owen's tale of economic collapse Ms. Jones made up her mind to provide assistance and called Ms. Owens at her job.  Trial Tr. 15:18-19.  Questioned by her lawyer, Ms. Jones testified as follows:

> Q: (Mr. Newhouse): Now, when did you actually decide then that you were going to lend Tara money?
>
> A: (Ms. Jones): Immediately. I phoned her after receiving this email, I called her at work and told her that I would help her.
>
> Q: So, you made your decision solely on the basis of this email?
>
> A: That is correct.
>
> Q: Why didn't you feel that you needed to get more information from her?
>
> A: I felt that she had described to me in detail what crisis she was facing. . . . I felt I could trust the information she had given me at that time.
>
>             *      *      *
>
> A: . . . She gave me a list of account numbers and telephone numbers of creditors to start calling.
>
> Q: And did you do that?
>
> A: I did do that.

Trial Tr. 15:16-25; 16:23-25; 17:1.

Ms. Jones asserted that her goal in undertaking this commitment was, ". . . to get [Ms. Owens] to establish a good sound financial footing."  Trial Tr. 20:25, 21:1.  On June 3rd and 4th, 2010, Ms. Jones paid a total of $3,163.63 in either direct creditor payments or a cash loan to Ms. Owens.  Pl.'s Ex. 3.  On June 14th, she paid $6,804 to an entity identified as "FCO".[9]  *Id.*

---

[9] The Court cannot find either a corresponding amount or name listed in Ms. Owens' accountings but there is no dispute that this money was paid on her behalf by Ms. Jones.

On June 18, 2010, Ms. Owens sent a second email (June 18th Email) that provided a supplemental and more extensive accounting of her debts.  Pl.'s Ex. 2.  Ms. Jones gave direct testimony as follows as to that email:

> Q: Do you have any idea what the difference is between these two?
>
> A: Well, it went from about 65 to 111. But, the difference major being $12,000 if you subtract the items she listed under Grandma Barb which is her grandmother and those items were being disputed at the time.
>
>            *       *       *
>
> Q: So, if you subtract that out as not indebtedness of hers and take that into account, then the difference between the June 2nd and the June 18 amount is what again?
>
> A: $12,000.
>
> Q: $12,000. Did that concern you?
>
> A: No.[10]

Trial Tr. 19:2-7, 14-19.

Despite the new information contained in the June 18th Email and the implied admission that Ms. Owens' debts were significantly greater than originally revealed, Ms. Jones continued to aid Ms. Owens and by August 11, 2010, had paid an additional $15,182.75 towards her debts. Pl.'s Ex. 3.

Ms. Owens also indicated in the June 2nd Email that she needed to move and Ms. Jones decided to help her with that endeavor.  She did so by signing a tenant lease to secure housing for

---

[10] The Court's review of the two emails suggests a much higher difference than $12,000 between their totals, although the analysis is confusing.  The shorthand references used by Ms. Owens make it difficult to tell which creditors are duplicated, yet there is at least one creditor (Monteray Collections - $15,603) that all agree was not included in the June 2nd Email.  It also appears that the debts paid by Ms. Jones two weeks prior were replaced by other creditors, in a rough sense.  While certainty is therefore lacking, the Court concludes that the total amount included in the June 18th Email was at least $20,000 more than the sum previously disclosed even if the "Grandma Barb" sum of over $34,000 is excluded.

Ms. Owens at a monthly rental rate of $1,650.  Ms. Jones' direct testimony on this topic was, in part, as follows:

> A: In the 2 June email, Tara said that she needed to move, she filled out an application, her credit [expletive deleted] and she couldn't do that. So, we discussed that I would, because of her financial situation, I would lease a townhouse for her, which I did with the understanding that she would be solely responsible for the rent and all utilities and any expenses arising from that rental.
>
> \*       \*       \*
>
> So, within two weeks that lease [for premises rendered uninhabitable by fire damage] was terminated and we moved into the place in Baltimore on Milton Street.

Trial Tr. 22:16-22; 23: 23-25.

Although Ms. Jones paid the security deposit and was the named tenant, the parties agreed Ms. Owens would make the payments directly to the landlord in order to leave Ms. Jones practically, if not legally, free of the obligation.  Trial Tr. 26:14-15; 28:2-4.  However, this arrangement quickly fell apart as Ms. Owens was late with the first (August) rent payment.  Trial Tr. 24:25; 25:1-2.  Thereafter, beginning in September, Ms. Jones made the payments upon the understanding that Ms. Owens would pay her back.  Trial Tr. 25:5-7.  Ms. Owens only kept this promise in a piecemeal fashion and three months later, Ms. Jones concluded the rent would not be regularly paid (or repaid) by Ms. Owens.  *See* Trial Tr. 25:16-20, 25; 26:1.  Nevertheless, she continued to pay the rent at least until June 2011.[11]  Def.'s Ex. 1 at 6.  During this time *and notwithstanding Ms. Owens' inability to pay the rent and her general financial shambles*, on September 10, 2010 Ms. Jones paid $3,500 toward a down payment for Ms. Owens purchase of a BMW car.  Pl.'s Ex. 4, Trial Tr. 35:10-16.

---

[11] Ms. Jones testified that she felt compelled to continue paying the rent to protect her security clearance from an adverse credit history.  Trial Tr. 26:6-9.

By late January 2011, the parties' relationship had finally soured beyond repair.  In an email dated January 26, 2011, Ms. Jones expressed frustration with Ms. Owens' failure to pay the rent, inability to get a raise or apply for a student loan.  Pl.'s Ex. 6.  Ms. Owens, on the other hand, lamented the state of her finances, the fact that the two no longer communicated, and reiterated that she intended to make good on the debts.  *Id.*  By July 2011, the total amount due Ms. Jones was likely in excess of $40,000.  Pl.'s Ex. 8; Trial Tr. 65:20-25, 66:1-7; 67:8-10; Def.'s Ex. 1 at 6.[12]

The evidence does not support a finding that the parties agreed to a specific repayment plan at the time the loans were made.  When asked on direct examination whether there was an understanding or agreement as to repayment at that time, Ms. Jones testified, "Yes.  Tara was scheduled to receive a (sic) increase in salary in January 2011.  We also talked about her getting a student loan to repay me."  Trial Tr. 17:12-14.  This does not reflect a meeting of the minds as to vital contractual terms.  For her part, Ms. Owens acknowledged her obligation to repay the money and agreed that the payment of interest would be reasonable.  Trial Tr. 61:6-12, 63:9-16.  The lack of a definitive agreement is best reflected by the earnest email negotiations that ensued after the romance was over and which culminated in the parties' ultimate failure to reach final repayment terms.  Pl.'s Ex.'s 5-16; Trial Tr. 29:7-25; 30:1-16.  Eventually, Ms. Jones filed a complaint against the Defendant in the Circuit Court for Baltimore City.  Trial Tr. 30:5-7.

The crux of the case is this: the debt list provided to Ms. Jones in the June 2nd and June 18th Emails did not include Ms. Owens' then existing student loan debts of over $56,000.  Pl.'s Ex. 19.  Ms. Owens testified that she did not include the student loans because they were in deferment, did not have to be paid at that time and were not an immediate source of vexation for

---

[12] An attachment to Ms. Jones' Proof of Claim (Def.'s Ex. 1) indicates that Ms. Owens re-paid her at least $6,011.88.  However, during trial, Ms. Jones would only concede payments of no more than $3,300.

her.  Trial Tr. 49:15-18.  Ms. Jones, on the other hand, makes the failure to disclose the student

loan debt the linchpin of her case – she insists that had the Defendant disclosed to her the

existence of the student loan debt she would not have made the loans that she seeks to except

from the discharge.  Trial Tr. 19:24-25, 20:1-2.  She testified as follows on this point:

> Q: Had you been aware of Ms. Owens' student loan debts, would
> you still have loaned her the money?
>
> A: No, I wouldn't have.
>
> Q: Why not? What is the problem?
>
> A: Well, for me it would have made the situation more hopeless.
> Looking at what she provided for me I felt like I had the resources
> to help her.  Adding more to this, I don't have it, I would not have
> been able to help her.  We would still ended up in bankruptcy
> likely.

Trial Tr. 19:20-25; 20:1-3.  Hence, her case stands or falls upon Ms. Owens' omission of

the student loan debt in the accountings included in the two emails.[13]

## IV.    Jurisdiction and Venue

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §

1334(b) and Local Rule 402 of the United States District Court for the District of Maryland.

This is a core proceeding pursuant to Section 157(b)(2)(I).  The Court concludes that the entry of

a final judgment in this Adversary Proceeding will not offend the strictures expressed in *Stern v.

Marshall*, 131 S.Ct. 2594 (2011).  Venue is proper under 28 U.S.C. § 1409(a).

---

[13] Ms. Jones also relies upon alleged unfulfilled fraudulent promises by Ms. Owens to pay the debt in the future and
the omission of a past due timeshare obligation from the two emails.  However, promises of future performance are
generally not actionable under Section 523(a)(2)(A).  *Bank of Louisiana v. Bercier (In re Bercier), 934 F. 2d 689,
692 (5th Cir. 1991).*  Moreover, it is undisputed that the timeshare obligation was listed in the June 18th Email albeit
under the moniker, Monteray Collections in the amount of $15,603.  Pl.'s Exh. 2 at 2.

## V.   Legal Standards

In *Baltimore County Savings Bank, FSB v. Quillen* (*In re Quillen*), Adv. No. 07-00839,

Dkt No. 49 (Bankr. D. Md. 2010), the Oversigned considered the application of Subsections

523(a)(2)(A) and (B) to the facts of that case and, moreover, the important distinctions that must

be drawn between these two similar but distinct provisions that except from a discharge debts

incurred by fraud.  Those observations apply to the questions raised by this dispute.  In *Quillen*,

the Oversigned wrote:

> ### a.   Section 523(a)(2)
>
> BCSB's two-count Amended Complaint seeks to have the
> debt arising from the BCSB Loan declared nondischargeable under
> subsections (A) and (B) of Section 523(a)(2).  Section 523(a)(2)
> excepts from an individual debtor's discharge debts,
>
> for money, property, services, or an extension, renewal, or
> refinancing of credit, to the extent obtained, by -
>
> > (A)   false pretenses, a false representation, or actual
> > fraud, other than a statement respecting the debtor's
> > or an insider's financial condition;
> >
> > (B)   use of a statement in writing-
> >
> > > (i)    that is materially false;
> > > (ii)   respecting the debtor's or an insider's
> > > financial condition;
> > > (iii)  on which the creditor to whom the debtor is
> > > liable for such money, property, services, or
> > > credit reasonably relied; and
> > > (iv)   that the debtor caused to be made or
> > > published with the intent to deceive.
>
> 11 U.S.C. §§ 523(a)(2)(A) and (B).  Subsections (A) and (B) are
> similar in that a plaintiff seeking to except a debt from the debtor's
> discharge under either must prove their case by a preponderance of
> the evidence.  *First Nat'l. Bank of Md. v. Stanley (In re Stanley)*,
> 66 F.3d 664, 667 (4th Cir. 1995) (citing *Grogan v. Garner*, 498
> U.S. 279, 291 (1991)).  However, while the burden of proof is the

same, there are other important differences between how each should be applied.

**b.        Exception from Discharge Under Section 523(a)(2)(A)**

It is well established that to prevail in a nondischargeability action under Section 523(a)(2)(A) five elements must be satisfied by the plaintiff. *Grogan,* 498 U.S. at 288; *In re Rountree,* 478 F.3d 215, 218 (4th Cir. 2007); *Dubois v. Lindsley (In re Lindsley)*, 388 B.R. 661, 668 (Bankr. D. Md. 2008); *Guaranty Residential Lending, Inc. v. Koep (In re Koep),* 334 B.R. 364, 371-72 (Bankr. D. Md. 2005). Those elements are: (1) that the defendant made a representation, (2) that the defendant knew at the time the representation was made that it was false, (3) that the defendant made the representation with the intent and purpose of deceiving the plaintiff, (4) that the plaintiff justifiably relied upon the false representation, and (5) that the plaintiff suffered damages as a proximate result of the representation. *Lindsley*, 388 B.R. at 668; *Koep,* 334 B.R. at 371-72.

Plaintiff avers that in executing the Application, the Letter, the Affidavit, and the BCSB IDOT, the Defendant made the representation that BCSB would be in a first lien position. Plaintiff further avers that the Defendant knew the representation was false when made, that the representation was made with the intent and purpose of deceiving the Plaintiff, that Plaintiff justifiably relied upon the statement, and that Plaintiff was damaged as a result. Accordingly, Plaintiff asserts that the resulting indebtedness should be excepted from Mr. Quillen's discharge pursuant to Section 523(a)(2)(A).

However, as a matter of law, there is a fatal flaw in this contention. The Fourth Circuit has expressly held that statements respecting a debtor's financial condition are excluded from the purview of Section 523(a)(2)(A). *Johnson v. International Harvester Co.,* 702 F.2d 490, 491 (4ᵗʰ Cir. 1983).[14] It requires no searching inquiry to reach this conclusion. The statutory language could not be any clearer. Were Mr. Quillen's representations ones concerning his financial condition?

In *Johnson* (sic), the debtor made various oral representations to creditors regarding the financial health of her (sic) business. Both the bankruptcy and district courts agreed that

---

[14] The case citation included in the quote is in error. The correct citation is *Blackwell v. Dabney*, 702 F.2d 490, 491 (4ᵗʰ Cir. 1983).

the resulting debts should be excepted from the debtor's discharge as having been obtained by false representations pursuant to Section 523(a)(2)(A). The Fourth Circuit reversed holding that:

> All of the statements made by Blackwell to the plaintiffs were essentially statements concerning the financial condition of Studio-1. Further, all of Blackwell's statements were oral. The representations are therefore outside the scope of [Section 523(a)(2)] and can not be the basis for preventing discharge of the bankrupt.

> *Johnson* (sic), 702 F.2d at 492.

The next year, in *Engler v. Van Steinburg, (In re Van Steinburg)* 744 F.2d 1060, 1061 (4th Cir. 1984), the Court dealt with facts superficially similar to those at bar. In that case, plaintiff was orally assured by the debtor that he would have a first lien on certain property notwithstanding the debtor's knowledge of existing superior liens.  In the bankruptcy court, Judge Mannes refused to except the debt from the debtor's discharge ruling that the representations related to debtor's financial condition and therefore had to be in writing to be actionable.

The appellant argued that Section 523(a)(2)(A)'s caveat only applied to formal financial statements relying upon *In re Pollina*, 31 B.R. 975 (D.C.D.N.J. 1983).  The Fourth Circuit disagreed and held as follows:

> Concededly, a statement that one's assets are not encumbered is not a formal financial statement in the ordinary usage of that phrase. But Congress did not speak in terms of financial statements. Instead it referred to a much broader class of statements – those "respecting the debtor's… financial condition."  *A debtor's assertion that he owns certain property free and clear of other liens is a statement respecting his financial condition.* Indeed, whether his assets are encumbered may be the most significant information about his financial condition.

> *Engler*, 744 F.2d at 1060-61 (emphasis added).  This Court gleans three simple lessons relevant to this case from those two decisions:

1. Statements respecting a debtor's financial condition are not actionable under Section 523(a)(2)(A);

2. In order to be actionable, under Section 523(a)(2)(B), such statements must be in writing; and

3. Statements concerning the presence, or lack, of encumbrances against assets are statements concerning a debtor's financial condition.

It would therefore seem inevitable that Plaintiff's claim under Section 523(a)(2)(A) must fail as it is undisputed that Mr. Quillen's representations concerned BCSB's anticipated lien status against the Real Property. However, Plaintiff suggests that Mr. Quillen is equally guilty of the crime of omission – that he failed to disclose the grant of the Intervening IDOT when he had a duty to do so – and that 'separate' failure is actionable under Section 523(a)(2)(A). Specifically, Plaintiff contends, "[i]n addition to the Debtor's numerous false statements, his silence on a material element of BCSB's loan decision process amounts to an intentional misrepresentation."  (Pl.'s Mem. Dkt. No. 47 ¶ 23).  Cast in those terms, does the claim survive?

Plaintiff relies upon Judge Catliota's opinion in *Ultra Litho, PYT, Ltd. v. Moore (In re Moore)*, 365 B.R. 589 (Bankr. D. Md. 2007) to claim that it should. It is true that Judge Catliota held that a misrepresentation may be implied by silence – where a duty to speak exists but the debtor fails to do so – but the analysis was made under Section 523(a)(2)(A) and, as explained above, that subsection does not apply to this case. Whether the problem is one of omission, or that of an active misrepresentation regarding lien status, a strict interpretation of the statute leads to the conclusion that in either case, the claim arises, if at all, from a failure to honestly represent one's financial condition. Therefore, it falls outside the parameters of Section 523(a)(2)(A).

### c. Exception from Discharge Under Section 523(a)(2)(B)

To sustain an action under Section 523(a)(2)(B) the plaintiff must establish that: (1) the debtor  made a written statement, (2) the written statement was about the debtor's or an insider's financial condition, (3) the statement was materially false, (4) the debtor published the statement with the intent to deceive the plaintiff, and (5) the plaintiff reasonably relied on the false statement to her detriment. *Ins. Co. of N. Am. v. Cohn (In re*

*Cohn)*, 54 F.3d 1108, 1114 (3rd Cir. 1995); *In re Koep*, 334 B.R. at
373; *AVCO Fin. Servs., Inc. v. Abdul'Faruq (In re Abdul'Faruq),*
175 B.R. 618, 622 (Bankr. E.D. Va. 1994); *I.H. Miss. Valley
Credit Union v. O'Connor (In re O'Connor)*, 149 B.R. 802, 807
(Bankr. E.D. Va. 1993).

As with its companion provision, case law has elaborated
upon the subsection's plain language to provide practical guidance.
For instance, with respect to the first element, the statement must
have been either written by the debtor, signed by the debtor, or
written by someone else and then adopted and used by the debtor.
*Engler v. Van Steinburg*, 744 F.2d 1060 (4th Cir. 1984).
Furthermore, the statement must concern the debtor's financial
condition or that of an insider. In this Circuit, the term 'financial
condition' is properly given a broad scope.  Its meaning reaches
well beyond a 'formal' financial statement that merely lists
columns of assets and liabilities in the traditional manner. *Engler,*
744 F.2d at 1060-61.  Moreover, the inclusion of the defined term
'insider' brings in to play the wide net of Section 101(31).

A materially false statement is one that, "paints a
substantially untruthful picture of a financial condition by
misrepresenting information of the type which would normally
affect the decision to grant credit." *Jordan v. Se. Nat'l Bank,* 927
F.2d 221, 224 (5th Cir. 1991) (quoting *In re Nance,* 70 B.R. 318,
321 (Bankr. N.D. Tex. 1987)); *In re O'Connor*, 149 B.R. at 807.
Mere inaccuracy is not sufficient; there must be a significant
understatement of liabilities or overstatement of assets in order for
the falsity to be material.  *In re Koep*, 334 B.R. at 373.  A relevant
inquiry is "whether the lender would have made the loan had he
known the debtor's true situation."  *In re Bogstad,* 779 F.2d 370,
375 (7th Cir. 1985).

With respect to the element of reliance, the creditor must
establish not only that the statement was relied upon but that the
reliance was reasonable. *In re Cohn,* 54 F.3d at 1114-17 (finding
"reliance…is judged by an objective standard, i.e., that degree of
care which would be exercised by a reasonably cautious person in
the same business transaction under similar circumstances.").
When a lending institution is involved, several factors should be
examined to determine reasonableness. These include, (a) the
standard practices employed by the creditor to evaluate
creditworthiness, (b) industry standards that define a commercially
reasonable investigation of the information supplied by the
borrower, and (c) whether there were any 'red flags' of inaccuracy

waving at the time of the transaction that should have put a prudent lender on alert. *In re Cohn,* 54 F.3d at 1117.

Finally, the statement must be 'published', or made known, with the intent to deceive. In this context, intent to deceive means that the statement was either knowingly false or made so recklessly as to warrant a finding that the debtor acted fraudulently. *In re Cohn,* 54 F.3d at 1118-19. With the foregoing principles and reasoning in mind, the Court will now analyze the transactions at bar under Section 523(a)(2)(B).

*Quillen,* Adv. No. 07-00839, Dkt. No. 49 at 15-20.

**VI.**   <u>**Analysis**</u>

    **A.**   ***Section 523(a)(2)(A) Does Not Apply to Statements Concerning the Debtor's Financial Condition and the Alleged Claims Under that Subsection that Rely Upon Ms. Owens' Emails Shall be Dismissed***

Count I of the Amended Complaint avers that the debt owed to Ms. Jones should be excepted from Ms. Owens' discharge under Section 523(a)(2)(A). The evidence produced at trial confirms Ms. Jones' core allegation to be that Ms. Owens did not disclose her large student loan debt in either of the two emails and had Ms. Jones known of its existence, she would not have lent *any* money or extended any credit.[15] The emails are undoubtedly statements respecting Ms. Owens financial condition as they set forth her income, expenses and debts past due as of June 2010. And if that were not enough, the income and debt listing included in the June 6th Email was prefaced and embellished with Ms. Owens' lengthy, personal narrative of just how bad things were for her financially. Whether a particular debt exists, or should have been included among those listed in the emails to insure a reliable financial profile, is purely a question respecting Ms. Owens' financial condition. Just as with the existence and priority of liens in *Engler*, such statements must, as a matter of law, be in writing in order to be actionable

---

[15] Ms. Jones likewise alleged that a timeshare debt, listed in Ms. Owens' bankruptcy Schedules, was not disclosed in the emails. However, there is no dispute that the "timeshare" debt is the Monteray Collections debt referred to in the June 18th Email. Pl.'s Exh. 2 at 2.

and if in writing, they may only be brought under Section 523(a)(2)(B).  If Section 523(a)(2)(B)'s express inclusion of a "statement in writing" that is "materially false" regarding the debtor's "financial condition" as a ground for excepting a debt from discharge was not enough to convince, then Section 523(a)(2)(A)'s equally firm exclusion of "statements respecting the debtor's or an insider's financial condition" from its scope should be sufficient to confirm the primary dividing line between the two subsections.  In short, an exception to discharge claim that is based upon misrepresentations (whether active or silent) regarding a debtor's financial condition must arise from a writing in order to be actionable in this Circuit and then only under Section 523(a)(2)(B).  Hence Count I of the Amended Complaint must be dismissed as a matter of law to the extent it relies upon the two emails.[16]

> **B.**   ***Count II of the Amended Complaint Shall Likewise be Dismissed as Ms. Owens' Omission of her Student Loan Debt was not Materially False, there was no Intentional Deception by Her and it was not Reasonable for Ms. Jones to Rely Upon the Written Statements to her Detriment in Making the Loans***

In this Section each element of Section 523(a)(2)(B) shall be examined separately.

> 1.   *Did the Debtor make a written statement?*

The answer to this question is 'yes'.  The cause of action is largely based upon the June 2nd and 18th Emails and Ms. Owens' failure to disclose within them the existence of her student loans.

> 2.   *Was the written statement about the Debtor's financial condition?*

The answer here is likewise 'yes'.  The two emails speak of almost nothing but Ms. Owens' financial condition.

---

[16] Ms. Owens also relies upon two alleged fraudulent promises of future conduct in support of her Section 523(a)(2)(A) claim.  Those allegations will be dealt with in Section C, *infra*.

3.    *Was the statement materially false?*

The Court concludes that the answer to this question is 'no'.  This is so because taking

into account the overall context of the relationship between Ms. Jones and Ms. Owens, and the

specific, 'emergency' context in which the statements were made, the information included in

the emails does not paint, "a substantially untruthful picture of a financial condition by

misrepresenting information of the type which would normally affect the decision to grant

credit." *Jordan v. Se. Nat'l Bank,* 927 F.2d 221, 224 (5th Cir. 1991)(quoting *In re Nance,* 70

B.R. 318, 321 (Bankr.N.D.Tex.1987)); *In re O'Connor*, 149 B.R. at 807.  One important

question is "whether the lender would have made the loan had he known the debtor's true

situation."  *In re Bogstad,* 779 F.2d 370, 375 (7th Cir. 1985).  In view of the context in which the

loans were made, and if "material" means whether the information would have been important to

Ms. Jones' decision to lend, the Oversigned can only conclude that advance knowledge of the

existence of the student loan debt would not have swayed her one bit in her commitment to make

the loans.  This is so for several reasons.

A successful Section 523(a)(2)(B) claim often results from a debtor's effort to deceive

the creditor through the depiction of a substantially rosier financial picture than exists at the time

the statement is made.  See *In re Batie*, 995 F. 2d 85, 88 (6th Cir. 1993); *In re Poskanzer*, 143

B.R. 991, 994 (Bankr. D.N.J. 1992).  In contrast, Ms. Owens' self-composed depiction of her

financial affairs falls far on the other end of the spectrum – it is a singular, honest confirmation

of her personal, financial distress.  In the June 2nd Email, Ms. Owens stated, "I already know

that I have to be one of the most careless, irresponsible individuals in the world at this moment

and I already know my decision making skills have [expletive deleted] over the past few years."

And then, "[m]y bank account is shut down and they will take anything I get until the lien is

paid… Meanwhile I have every bill coming out of the [expletive deleted]… Evertything (sic) is

late, past due, I can't even use my credit cards. . . ." And finally:

> I called [a lender] to see if I could get a personal loan to try to get
> this stuff together, I was excited it sounded hopeful, the lady said I
> could borrow $15,000.00 for 2 to 3 years paying back $300 to
> $350 a month initially, but with a credit score of 2, no bank will do
> it until I get a good payment history and get the score up.  I
> couldn't even get the $4,300.00.

Pl.'s Ex. 1 at 1-3.

The unsparing narrative was accompanied by a numerical accounting of the details of Ms.

Owens' financial distress that concluded with a bottom line of her being approximately $64,000

in debt with no ability to make good on her obligations.  This is not a situation where the

Defendant tried to sanitize, hide or cover up her disastrous financial situation.  To the contrary,

the emails succinctly lay out the worst as a part of a frenzied plea for help.  Against this barren

landscape, it is not reasonable to believe that Ms. Owens purposefully omitted the student loan

debt in order to make her financial picture somehow appear better than it was.  She only had 9

dollars to her name and was facing the prospect of an ongoing attachment from the

Commonwealth of Virginia as the most aggressive creditor action among the potential for many

others.  If the question is, was Ms. Owens a good, reliable candidate to lend money to, her

financial circumstances − including her incontestable inability to repay her debts − could not

have appeared significantly worse from the picture she honestly presented.  The fact that the

student loan debt was in deferral and therefore not an immediate cause of stress − a fact

unrebutted − was probably the only bit of good news by comparison.  Beyond that, red flags of

warning were unfurled at every post.

Yet, after reading the June 2nd Email, and without any inquiry or investigation to

determine accuracy, Ms. Jones began paying Ms. Owens' debts.  After a small percentage of the

overall obligation was paid and $800 lent by Ms. Jones, Ms. Owens supplemented the June 2nd Email on June 18th with even worse news – her total indebtedness was at least $20,000 (and probably more) than she had originally indicated.  But that fact did not slow down Ms. Jones. She continued to extend money and credit.  Soon, thereafter, she engineered a rental living arrangement for Ms. Jones, paid the security deposit, signed the lease and made virtually all of the rental payments that were supposed to have been Ms. Owens' responsibility.  If all that were not enough, Ms. Jones then gave Ms. Owens a $3,500 down payment for a BMW and this after Ms. Owens had already defaulted on her promise to make the rental payments.  Ms. Jones' intent, attitude and viewpoint – what was held within her mind and heart at the time − are capsulized and made vivid by these undisputed facts.  The Court concludes that to properly gauge the materiality of the student loans in this unique fact pattern, Ms. Jones' outlook is just as relevant as is Ms. Owens'.

In short, that means that had the student loans been disclosed by Ms. Owens, knowledge of them would not have mattered one whit to Ms. Jones.  Ms. Owens' admission of utter personal financial incompetence did not matter to Ms. Jones.  Nor did the (at least) $20,000 increase in the quantum of how much financial distress Ms. Owens acknowledged between June 2nd and June 18th.  Finally, even after Ms. Owens either would not or could not pay the monthly rent and Ms. Jones had to immediately *pick up the payments herself*, Ms. Jones was still willing to front the $3,500 down payment on a BMW for Ms. Owens.  This is not the circumspect behavior of someone who intends to extend credit only if a sound financial footing exists.  Especially in the case of Ms. Jones – she is an intelligent, high achiever with a solid military and professional career.  In light of all of the above, Ms. Jones' behavior convinces the Court that the prospect of repayment and any attendant risks ran a distant second to her effort to show Ms. Owens that she

cared.  If Ms. Owens had told Ms. Jones of the student loan debt, the Court concludes that Ms.

Jones would have viewed it as simply more of the same and not very different from the disaster

already revealed.  There is no logical reason as to why knowledge of the student loan debt would

have made a significant difference to her decision to lend under these circumstances in view of

her documented willingness to go forward in the face of disaster.  After all, Ms. Jones did not

pay Ms. Owens' debts in full but only certain select items.  Likewise, if, as Ms. Jones testified,

the presence of the student loans would have made the likelihood of repayment a riskier

proposition, the undisputed facts establish that she did not seriously discuss repayment terms

with Ms. Owens when the loans were made.  Overall, the attendant risk does not seem to have

been paramount.  The Court cannot escape the notion that Ms. Jones assumed this burden out of

a combination of her good nature and intense feelings for Ms. Owens.  Within this special,

emotional calculus, fore-knowledge of the student loan debt would not have mattered.

Therefore, the Court concludes that the existence of the student loan debt was not a material fact

that should have been disclosed by Ms. Owens.

       4.    *Did the Debtor Publish the Statement with the Intent to Deceive?*

       For many of the reasons explained above, the Court concludes that the answer to this

question is also 'no'.  The evidence confirms that Ms. Owens' written tale of financial woe was

accurate insofar as she intended to list those debts that were past due, the most vexatious to her

and that had to be immediately paid.  She explained her failure to disclose the student loans by

stating that they were (1) in deferment and (2) not an immediate source of anxiety for her as they

did not have to be repaid immediately.  The Court concludes that Ms. Owens truly intended to,

and did, reveal those debts that she wanted (and needed) immediate relief from and that she

honestly believed that was what the circumstances called for.  She explained how terrible her

financial situation was and the prospect of repayment was left at best to the indefinite potential of a future raise in salary or subsequent student loan. It would be hard to imagine a person being more honest about their dire financial straits then Ms. Owens.

If Ms. Owens had revealed the student loans, she could have also truthfully stated that the loans were in deferment and were not an immediate headache. After all, there is no dispute that it was Ms. Owens' stress level that Ms. Jones was trying to settle. And there was no rebuttal to Ms. Owens' testimony that the loans were in deferment, not immediately due and payable and therefore not a source of stress. Therefore the Court concludes she did not intend to deceive Ms. Jones.

5.    *Did Ms. Jones Reasonably Rely upon the Falsity of the Statements?*

The answer here is also 'no' because the Court finds (a) the statements were not materially false and (b) Ms. Jones did not rely on the objective truthfulness of the emails in making the loans. When Ms. Owens wrote and delivered the crucial emails she believed she was providing Ms. Jones with the information needed for immediate help in deflating the stressful financial pressure she was experiencing. As the student loans were not a part of that dynamic, the financial picture provided by Ms. Owens was substantially accurate. Moreover, the Court finds that the parties' relationship would have caused Ms. Jones to lend the money and extend the credit even with knowledge of the student loans. The Court concludes that her willingness to make the loans stemmed more from her attraction to Ms. Owens and her hope the relationship would work than any reasonable notion of Ms. Owens' soundness as a candidate for a loan. Ms. Jones made no inquiries before deciding to make the loans on June 2nd. The $20,000 or more unexplained increase in Ms. Owens' total debt from June 2nd to June 18th did not deter her from lending more money and she did not ask any questions as to why the amount had increased.

23

Finally, even after Ms. Jones was personally stung by Ms. Owens' financial incompetence when Ms. Owens failed to pay the rent, Ms. Jones *still* decided to pay $3,500 towards the purchase of the BMW.  In short, it seems to the Oversigned that Ms. Owens' characterization of the events is the more plausible one – they were in a relationship, albeit brief, and each person was contributing what they had to offer.  In that vein, the Court concludes that if their relationship had flowered there would have been no serious attempts at collection through legal process by Ms. Jones.  This is not to say that the existence of a romantic relationship negates the possibility of fraud as each case must be decided upon its own merits in light of the particular facts and circumstances.  *In re Koep*, 334 B.R. at 372.  In this case however, the Court concludes that Ms. Jones was not relying upon the overall accuracy of the representations made as a part of a sober decision making process but only wanted to know the identities of the creditors who were putting pressure on Ms. Owens and the amounts owed so she could help.  Ms. Owens made several admissions in the June 2nd Email as to her financial carelessness, irresponsibility and total lack of judgement.  She did not know that she owed taxes, her credit report was terrible, and she could not qualify for a personal loan.  Any of these facts would lead a reasonably cautious person to conclude that lending money to Ms. Owens was as risky as a crap shoot.  Ms. Jones, a very intelligent person, willingly disregarded each of them.  Therefore, she did not rely on the accuracy of the information provided when she loaned money to Ms. Owens.

Even if this Court were to find that Ms. Jones relied upon the emails as a crucial decision point in making the loans, the Court could not find that reliance to be reasonable.  Lending money to (and expecting repayment from) someone who admits to being as financially challenged (to put it delicately) as Ms. Owens is not reasonable.  Accordingly, because the

statements were not materially false and Ms. Jones' reliance was not reasonable the Court finds that the final element of Section 523(a)(2)(B) is not satisfied.

### C. The Defendant's Alleged Promises Regarding Future Conduct are Insufficient to Form the Basis of Actionable Misrepresentations Under Section 523(a)(2)(A)

In support of her assertion that she does have a legitimate claim under Section 523(a)(2)(A) separate from the emails, Ms. Jones also relies upon two alleged fraudulent oral promises of Ms. Owens. Ms. Jones asserted that Ms. Owens' falsely promised to (1) pay the rent for her own residence and (2) obtain a student loan to pay the total debt in full. Pl.'s Post Trial Mem. at 12.

In order for a statement to qualify as a false representation under Section 523(a)(2)(A), "the statement must relate to a present or past fact." *In re Conlin*, 294 B.R. 88, 100 (Bankr. D. Minn. 2003), citing *Gadtke v. Bren (In re Bren)*, 221 B.R. 491, 496 (Bankr. D. Minn. 1998). In *Bank of Louisiana v. Bercier (In re Bercier)*, 934 F.2d 689 (5th Cir. 1991), the debtor promised to pledge a $50,000 bond as partial collateral for a loan. *Bercier,* 934 F.2d at 690. However, when the time came to settle the loan the debtor could not find the bond. The creditor made the loan anyway. After the debtor's default and bankruptcy filing, the creditor sought to have the debt excepted from the discharge, contending that the debtor falsely represented his intention to provide the bond. *Id.* The circuit court held:

> In order for Bercier's representation to be a false representation or false pretense under § 523(a)(2), the "false representations and false pretenses [must] encompass statements that falsely purport to depict *current or past facts*. [A debtor's] promise … related to [a] future action [which does] not purport to depict current or past fact … therefore cannot be defined as a *false representation or a false pretense.*"
>
>               *        *        *
>
> . . . BOL could not establish that Bercier's debt is nondischargeable under § 523(a)(2) because at the time the debt

> was entered into, Bercier did not make a false representation of a
> current or past fact when he said the bond was lost or a false
> representation or promise when he said that he would furnish it
> when he found it, or duplicate it if he could not find it.

*Id*. at 692.

Neither Ms. Owens' alleged promise to make the rental payments nor pay the total balance through a future student loan were representations of current or past facts at the time they were made. Moreover, and even if they were, for the reasons explained in Section B above, the Court does not believe it would have been justifiable under the circumstances for Ms. Jones to rely upon them. Likewise, for the same reasons, the Court does not believe Ms. Owens acted with fraudulent intent if she did make the statements. It bears repeating that she was as forthcoming as a person could possibly be about her personal financial crisis and that honesty trumps any negative inferences.

In this regard, the Order for Judgment on Dischargeability entered in *Stevenson v O'Herin (In re O'Herin,)* Adv. Pro. 08-3051, Dkt. No. 23 (Bankr. D. Minn. 2008) was heavily relied upon by Ms. Owens. The Court agrees there is an apt comparison between that dispute and this one. So much so that the *O'Herin* Court's summary could have been written for this case:

> While tempting, especially for Stevenson, to retrospectively
> characterize O'Herin as a crafty con who duped a kindly couple
> out of mounds of cash, the record does not support such a
> conclusion. The loan transactions here were made in awareness of
> and because of O'Herin's poor financial condition, and with both
> parties hopefully contemplating full eventual repayment, albeit
> based upon either erroneous perceptions and or overly optimistic
> possibilities. The funds were not obtained by fraud, and as such
> are not subject to exception pursuant to §523(a)(2)(A).

*O'Herin*, Adv. Pro. 08-3051, Dkt. No. 23 at 6.

**VII.    Conclusion**

In conclusion, Ms. Owens debt to Ms. Jones will not be excepted from Ms. Owens' discharge and the Amended Complaint shall be dismissed.  While Ms. Owens' discharge will terminate any legal obligation of hers to repay the debt and while Ms. Jones will be permanently enjoined from seeking or demanding repayment, Ms. Owens will be free to voluntarily repay the debt if that is still her wish. See Section 524(f).

cc:    All Parties
       All Counsel
       Chapter 13 Trustee

**End of Opinion**